and Mr. Kelly, whenever you're ready, we'll hear from you. Good morning, Your Honors. May it please the Court, Edward Kelly on behalf of the appellants and, of course, indirectly the victims in this case. Your Honors, I believe the best place to start this morning is a quote from the District Court below the Honorable Richard Bennett at the proceedings that occurred on August 22, 2012. This was before the State had responded to the merits of the Brady claim that's at issue before the Court today. Judge Bennett, in the process of lecturing, a much younger version of myself, states, I don't know what the facts are of this case. I am not the jury of this man's guilt or innocence. But I know a Brady violation when I see one, and this is pretty clearly a Brady violation. If I can repeat and paraphrase, I don't know what the facts are of this case, but I know a Brady violation when I see one. These words illustrate the root problem. Judge Bennett clearly prejudged this case. What caused him to do so? The record answers that, too. At the proceedings that occurred in State Court following these proceedings on March 7, 2013, Mr. Garenther, counsel for the appellee, informs us that Judge Bennett has an unusually rigorous pre-trial process in criminal proceedings that requires the prosecutor to divulge in camera any potential Brady material. Judge Bennett's comments at the two federal habeas hearings in this case make clear that he has a high threshold for Brady and a contempt for Brady violations. You know, speaking just for myself, I don't think it's really a great strategy to attack the district judge. No, I'm not attacking the district judge, Your Honor. What I'm saying is Judge Bennett has an approach to Brady that is well-intentioned, but when you place this in the context of a federal habeas case, that's where Judge Bennett made an error. With respect to favorability, Judge Bennett found unreasonable the State Court's determination, factual determination, that the Richard Benson and Jennifer McKenzie statements at best conflicted with the defense. Under it, State Court factual findings get extreme deference. A factual finding is presumed correct unless rebutted by clear and convincing evidence. Factual findings are judged based on the evidence presented in the State Court proceeding. The federal court can't simply replace or substitute its judgment for a State Court factual finding. Can you tell me the case that you'd rely on that talks about, that comes out and finds that there's no Brady violation because the evidence was not favorable? I mean, I just before this case, I have never seen the State assert that particular claim. It's always been about materiality because at least the cases that I've read, and I think the Supreme Court cases, don't say that the evidence has to be admissible, which is what you seem to be saying. It had to be in your case. It had to come within one of the State's procedural rules because I thought the theory was that anything that was helpful to the other side's case, that could lead them to witnesses, that could assist them in cross-examining, or to lead to a fruitful area, would be regarded as favorable. And I just hadn't seen the kind of analysis that you've put forth with respect to favorability. Well, the analysis that I'm trying to make is we are in an AEDPA case, and so we're looking at assessing a State court's factual determination as to whether it's favorable or not favorable. That's based on the fact that the Benson and McKenzie's statements, as found by the State court judge, are inconsistent with Nicholas's defense. So our argument is that is a reasonable factual finding. Because the statement... It doesn't have to be correct. It just has to be not unreasonable. Correct. And in this instance... I don't understand why you go that far. Let's take it a little bit beyond the facts of this case. Let's say you have two statements that relate facts that, if relevant to this case, would have given a totally different set of facts. But it happens to be not relevant. It relates to a different incident. Is that Brady material? I'm not sure I know exactly what you're saying with your hypothesis. Well, what I'm saying... I'll get to this case then. In this case, the statement... Both statements are fairly consistent about what happened. It's in that cul-de-sac, and they heard what sounded like a gunshot or explosion or a car backfiring or whatever. But it was a loud report coming down from in the cul-de-sac. Then they saw a man moving about in the car. Looking back, he was nervous. Somebody in the backseat. Tan car, light car, small car. There's a discrepancy about what happened to the car. It came back, according to one witness. But the question is, the only thing that that is useful for is, if that is a relevant incident, it places the gunshot at 10 o'clock. Is it 10 o'clock? Approximately. Approximately 10 o'clock. When the theory of the case, your case, is that it was at 8 o'clock. But my point is, if you look at the whole statement, and several state judges did look at the whole statement, it talks about an incident that happened in a cul-de-sac. They're consistent about that. They're consistent with the car and where it was, west of the building, the motel. Whereas the shooting in this case was east of the building, across the interstate, in a totally different direction, 180 degrees difference, and at a location that they could not have been seeing that incident. In other words, the question is, is that gunshot? Sure, it's inconsistent. They could have heard a gunshot at 11 o'clock at some other place down at the McDonald's or something, and that would be inconsistent. So my point is, is it inconsistent? Sure, the time is inconsistent, but is it relevant at all? I don't... And I'll be asking that to Mr. Grenther too, but the question, I suspect, comes down to the state judges looked at this and made a call about it. And the question is, is it consistent? The question is, what is a federal court's role after you have that, and how much deference? I don't know if the state judge is totally right or not, or whether I would have let them have it and ordered it so they could at least look at it and have it be impeached, the statements that is. But the standard's pretty high for a federal court. I'm in total agreement with... Yeah, I must be surprised if you disagree with any of that. I'm just raising this about the question that we're using words like favorable and material, and basically Brady talks about exculpatory evidence, and it has to have a level of materiality that it would have affected things had it been turned over, a level of prejudice, so what I'm trying to address is, are these statements, would they have been helpful to the defendant? Is there something that would have been useful for them to use? A report of the firing took place at a different time, which would have helped the defendant, but the question is, is the report of that firing relevant so that it would have to be produced? I just raised those factors. Let me ask you this, what kind of car was the defendant in? The defendant was in a blue Chevy Cavalier, I believe it was. I wouldn't good to be put in the brief, because it was pretty clear that these two people saw a light, small, tan car, or light colored car. There was a difference between the descriptions of the car, and I guess I don't want to belabor the favorability component so much, but to say... How do you define favorability? How are you defining favorability, and where does that word come from? Well, favorability comes from the Supreme Court case, and it's something that... What did they say about favorability? Favorability would, in the context of impeachment, which is the argument that was made below, I would argue that impeachment is something that's going to be able to change the state's... Support the defense case in a material... Not in favorability, it's not material, but something that is supportive of the defense case. I would argue, in my favorability analysis, one of the important points is when we went back into state court after the federal court sent it back a second time, we went back in and there was the entitlement, or the option for a state court evidentiary hearing, and that didn't occur in this case. What we have... What we are left with are the statements of Benson and McKenzie, which described this specific event, which involves this car and a cul-de-sac, an individual that has no relation whatsoever to the facts of Asia being shot and killed at a totally different location across a major highway. So we didn't hear from Mr. Benson, we didn't hear from Ms. McKenzie, we didn't hear from the cul-de-sac experts, so there was no connection to make these particular statements favorable. But the favorability analysis... Of course, the reason you didn't hear from them to begin with in the trial was because the state never revealed this evidence to the defendant, correct? So I mean, all that evidence could have come in, or the district court, or the trial court could have concluded that it was or is not admissible, but there was never that shot. The defendant never had that... So I'm not sure that that's... And in any event, it just seemed to me, and I really wasn't... I don't mean to make a, quote, federal case of this, but it seemed to me that your argument really here was about materiality. Well, and I would agree with that, and the analysis sort of overlapped, but one of the points I wanted to stress is that when we went back into state court, there was no attempt to establish the connection to what Richard Benson and what Jennifer McKenzie heard could have been something else. The defense's claim was that could have been the shot that occurred somewhere else. Well, that connection was never made. If that's what made it favorable, that connection was not made. But in terms of materiality, again, the standard under AEDPA is incredibly deferential to the state's court. The state court decision survives scrutiny unless the decision of the state court is beyond the possibility of any fair-minded disagreement. In this case, that possibility of fair-minded disagreement is reflected in the numbers. The five state court judges have reviewed the merits of the Brady claim, and all five have uniformly determined that it wasn't material. Well, that doesn't do the day before, because we have Supreme Court cases where it's been up and down and around in many state courts, so you just don't count numbers. Maybe you don't count numbers, but I think when you're looking at terms of the possibility of fair-minded disagreement, you have to look at what happened in the state court. In this case, there are reasoned state court decisions that place these two pieces of paper, essentially. It's never gone beyond the pieces of papers that reflect the statements, and whether those statements would have undermined confidence in the jury's verdict. And I would submit this wasn't a close case. This was a case that was tried over three weeks. The state put on a powerful case. Remember, Mr. Nicholas was at the scene of the murder. The murder occurred in his car. The story that he explained to the police and explained to trial was that he got followed by a rogue road rage driver, and instead of driving his car to safety, ends up driving his car down a desolate road, bullies lane, pulls over to the left side of the car, turns his engine off, turns his lights off, puts Asia in the most particularly dangerous position. Then he emerges from the car. The shooting occurs. The driver drives off. Mr. Nicholas, a trained emergency medical technician, doesn't even check on his daughter's condition before he goes on foot. Is his statement of the case that his driver's door was open and the shooting occurred through the front door? Through the passenger door with the window down? Well, I thought she was shot on the left side of the face. That's correct. She turned her head. I mean, isn't that what? I guess that was the theory. Because she was looking at the shooter. But you know, the story itself had all sorts of holes. It was incredible on its face. And, you know, that is the, these particular statements don't end up impeaching the Levitity testimony. They actually, there's been no really offer of what these statements would impeach. I mean, traditionally, the traditional impeachment analysis. Well, the impeachment would clearly be if they were, their argument is that it places the gunshots at 10 o'clock, which undermines your whole case. Well, only if those witnesses would testify to that effect. We have no evidence whatsoever that those witnesses would actually testify to something  I understand, but the statements indicate a 10 o'clock gunshot sound. Right. But it can't be divorced from what the witnesses were actually visualizing. I understand that, too. But you were saying you couldn't find out how it helped their case. That's the argument they make is that it places the gunshot sound, if it is that gunshot, at 10 o'clock. And my argument would be the statements, if they'll have to speak for themselves, do not support Nicholas's argument. And Mr. Nicholas has argued below, has even agreed that the statements don't speak for themselves, that he needed to incorporate an acoustical expert to link the shot to somewhere else. And that was never done in this case. All right. Thank you, Mr. Kelly. You have some rebuttal. Mr. Guenter. Please support Jeff Garrett there with my colleague, Matt Reinhart. We are appointed by the court, and we are privileged to represent Mr. Richard Nicholas today. Judge Niemeyer, I'm going to get right to your question, because I know from Spencer v. Roxbury, you're no less committed to enforcing Brady than is Judge Bennett. And I want to address very directly your question, if you'll allow me two brief paragraphs of background. This was a horrible crime. A young girl, a child, died brutally. Her family, understandably, wanted justice. The whole city wanted justice. If you remember back to the Spencer v. Roxbury case, it was 1991 in Annapolis. It was known all throughout town. It was a big deal then. Well, this event in 1996, Baltimore City, was an even bigger event. More vulnerable victim. Not just a brutal beating, as in the Spencer case, but a killing. And an entire city wanted justice. So that there was tremendous pressure on the two then young prosecutors doing this case. There can be no doubt about it. It's made obvious from the letters, now part of the record, that they sent to the medical examiner and to the lead detective, thanking them for winning the case by placing, as you just said, Judge Niemeyer, the crucial issue, the time of death, two hours earlier than the defendant said it happened. In this entirely circumstantial case against the defendant, the only issue was when. When that death occurred. Mr. Nicholas said it happened between 9.45 and 10 o'clock. The state left with only weak circumstantial evidence, such as he didn't seem as upset as he should have been. As if there is a prescribed way for a man to react. Maybe a man who holds in his emotions. Maybe a man, in this case, and there was clear evidence to this at the trial, a man who's got a serious stammer and stutter. He can't get out a word without calming himself down, without slowing down everything about himself. Otherwise, the upsetting circumstances will not allow him to say anything. I understand your 8 o'clock, 10 o'clock argument, and I think that's a powerful defense. The question that really I have is, well I have two questions, but this one is, if we have evidence of a gunshot, and it can be clearly established that that evidence, those statements related to this unrelated incident. Is that Brady material? Well, in other words, I looked at these statements, and I looked at the maps, and there is nothing that matches. And the statements are pretty consistent. They actually see the cul-de-sac, they see the cars, they describe the cars, they describe the man in there reaching back in the back, his actions. And they describe it in a direction 180 degrees different. They're actually visualizing it, it's not just a hearing a report, it's a seeing it. They saw the flash in that car. So it clearly could not be the gunshot that happened on the east side, 180 degrees away across the interstate, in a little side street. And if the prosecution receives statements like this, citizens reporting these gunshots, which is a good thing that they do, it helps the police a lot of times find witnesses, and the prosecution says these aren't relevant, and don't turn them over, we're now facing whether that was a Brady violation, and you have two, my second concern, that that's my first concern. May I deal with the first question? Go ahead, go ahead. Okay, because I could not disagree more strongly, your honor, with the premise of your question that this is clearly a different incident. Now clearly there was something happening with this car that was there in the parking lot, but let me try to put some geography on this incident, because last night, to get my bearings, I walked the 660 feet down Main Street, and I think the distance we're talking about is the distance from the front of the courthouse, down to the Christian Reading Room. It's not a distance issue, it's an issue, I'm looking at your photograph on page 22 of your brief, and they're in that, what is it, a motel they're in? Yes. Okay, they're in the motel, and they're looking down in the cul-de-sac there, and they both independently describe that cul-de-sac, and you have it marked on there, and they both independently describe it as a light car or a tan car, a small car, and they both describe the shot, they actually see the shot there, both of them see the flash and the shot, and they say, one of them says it was around 10, the other one didn't give a time, and then they give the subsequent reaction of the vehicle. So now, the question is, I'm looking at your map, and just about 180 degrees in the opposite direction is where your man was in a blue Chevrolet with the girl in the front seat, not in the back turning around like this, and not in the direction which they saw. They actually saw, it's not just hearing the gunshot and it could have reacted and come from someplace, they both saw the flash. Judge, I disagree with they both saw the flash, and this is a really important point. If you study their statements, what they're talking about is seeing a dome light came on. They never say, we saw the flash of a gun. They say, we heard the crack of a gun, and you know how loud... One of them says that. I'm sorry? The other one doesn't say a gun, but one of them says the crack of a gun. Well, I... Go ahead. The woman, Ms. McKenzie, says it was a loud sound, she thought it was a gunshot. If you look at the statement of Mr. Benson, he too said it was either a car backfiring or a gunshot. Now, of the two of them, he seemed more focused on thinking he knew where it came from, and you're on that point. I don't believe it was 180 degrees difference, and this was something we talked about in front of Judge Bennett. There's a record on this. The distance... Well, it looks like maybe five degrees off. I'm just looking at your chart. Well, I guess I would look at it this way. The shot that Mr. Nicholas says happened at the exact same time was 200 meters over to the left. This car was about where Judge Cogburn is, for me, in direction, not in distance. It was hundreds of feet away, but in direction. It wasn't way over here to the right. It wasn't a completely different direction. But Your Honor... Well, that's not what you're... You're familiar with your picture on 22. Why don't you look at your picture on 22 with us? Do you have it? All right, so I may be off. It may be a little more. I have never thought of it as being 180 degrees different. Well, it looks like it's opposite directions, basically. And the cul-de-sac is sort of going west, and the location of the murder was east. And it's across that... That's an interstate or an approach to an interstate, that big highway there. It's a road with two lanes on each side. It's a four-lane road at that time. I see the interstate signs right there. It says 695 in the picture, but... Yeah, that's what it is. But it's a larger road now than it was in 1996. 1996, it was two lanes. I understand. Well, Your Honor, let me... What page... Do you know what page the statement of... Mr. Benson? Yes. We're going to find it, Your Honor. I was looking at it just last night. Is that 456? Okay, I've got it here. So Your Honor, the reason I disagree with you, and I think the mistake you're making is you're assuming that the activity they saw in the car had to be linked to the sound. And I would ask you to put yourself in that situation. Let's say in front of the courthouse or out behind that motel where those two witnesses were that day. You hear a loud sound, and it's unmistakable. The sound of a 357 Magnum is, as we pointed out, the authoritative text in the record. It's 1,000 times louder than a jet engine at takeoff, a million times louder, and that's not hyperbole. It increases exponentially. It's a million times louder than a jet flying only 1,000 feet overhead. It's a very loud sound, and if you're standing in front of the courthouse and you hear a sound like that, we're all familiar with that phenomenon where people look around wondering where the sound came from. I don't think the witnesses say, we know it came from that car. They certainly don't say, we saw a flash of light that matches up with a gunshot. What they say is they saw the dome light come on, and they saw a car that seemed to be staying  But the thought that somebody in that car fired a gun. He said, and I saw this flash of light and heard a bang, but I didn't know what it was. I mean, I didn't know if it was. I don't know what it was like. It turned my head and looked like, I guess, when it was really happening, whatever. So you saw a flash of light and a bang. You heard a loud noise, right. And then, of course, the dome light came on and so forth. But so I mean, he's pretty direct head on and he describes the car. He describes the color of the car. He describes the two people in the car, one in the backseat, one in the front. Your point is that both of these people heard a noise and one or both of them said it sounds like a gunshot. And then they both looked around to see where it would be coming from. But they didn't necessarily say they couldn't say where the gun where the sound came from. But the only thing they saw that was a likely candidate of source was this car. Correct. Of course, they're looking for what Mr. Benson testified there when he was given his statement. He said he saw activity down there in this car parked near the trucks. And by then, he was not attracted to that by the bang. And as he was looking, he saw a flash and heard a bang. But let me let me say this. We the question is whether the state fact finders acted unreasonably out of bounds, so to speak, whether we agree or not, that the Supreme Court has told us we don't have to agree. We maybe would have required to turn it over. But the question is whether the state courts were out of bounds in finding facts and applying the law, the Brady provisions. And we had two state judges considering they both knew Brady and they knew the Brady principles and they were considering the Brady defense. And they both made rulings looking at this. And so the standard is, were they so far out of bounds that we have to insert ourselves in the state process? They were a judge. And I'll and I'll tell you why, particularly from Judge Berger's opinion. It would have been one thing if he had stopped and said simply this information would not have been favorable to the defense. That would be hard for me to understand because I would love to be able to try this case and put in front of the jury the fact that there was a gunshot that happened at exactly the same time Mr. Nicholas said it did. That would have been powerful evidence to have in front of the jury, regardless of what else the witnesses said, regardless of their effort to match it up with something they could see, which is quite natural to try to match it up to the activity of that car, which if there was a shooting, remember that car drove off and then came back and parked in the same place. Why you would do that if there's been a shooting in your car makes absolutely no sense. Dump the body. I'm sorry? Dump the body. This was another murder going on. It happened to be a bad night. Absolutely no evidence that that that happened. I understand. Yeah, but the point is. The question is, did the state judges review this with sufficient understanding of the law and the facts? Here's why I think they did not because Judge Berger didn't stop at it wasn't favorable. He actually goes on and says that information was actually more favorable to the state's theory of the case, and that I submit has no logic to it. Makes no sense at all. There's nothing about this story over here that supports the state's theory about a shooting that happened two hours earlier, 600 feet away. And, you know, the state says that Mr. Nicholas's story lacked credibility. Your Honor, think about what the state's theory of this is. The state's theory is he picks up his daughter. He drives her to the mall. He takes her into a crowded mall and has pictures taken with her. Takes her back out to the car, shoots her in the face, leaves her there in the passenger seat of a car in a crowded parking lot for two hours, goes back in to create an alibi by watching a children's movie for two hours, and then goes back and drives her home. That, to me, is the most preposterous part of part of the state's case. All of this came down simply to the timing question. And we know it from the letters that the prosecutors sent. Your Honor, I want to quote from them because I frankly have never seen letters like this. And I think it shows you the pressure they were under and just how giddy they were at being able to get a guilty verdict in this case. In the July 8, 1997 letter, this is at Joint Appendix 471, the prosecutors wrote to the lead officer, Officer Hanna, rumor has it that you were given a hard time about removing Asia's body from the car. The basic rule is you should not disturb the crime scene. We think that basic rule is a good one and should be followed. However, the reason you did it in this case is clearly understandable. We knew from the very first interview of you that you were overcome with concern with the instant that you saw Asia. Your feelings were so markedly different from those of the defendant. We want you to know that although moving her was not standard procedure, it turned out to be the right thing to do. Had you left her in the car, we would never have won this case. It's only because you did that the medical examiner saw the fixed lividity. This fact was the whole case. And then in the letter to the medical examiner, we are 100% certain that your testimony was the reason this jury had no difficulty reaching this verdict. So you had a police officer who never testified in court before, obviously emotionally involved, as many of us would be in this situation, but bound and determined to get a conviction. Prosecutors who felt similarly, and we know from their own letters after the case that the whole thing came down to that timing question. So think about it. Back in July, they hear about Ms. McKenzie's statement. They investigate Mr. Benson's arrest record. Then skip to September. They subpoena records from the Holiday Inn. They're not giving up in this. Then fast forward four months later, late January of 1997, they're facing a trial in a few months. They still haven't given up on this. And they know from his story that it matches up exactly with the timing. The last thing they wanted to do was give that evidence to the defense, confuse the jury. They knew about it. The prosecutors knew about it because they had issued a subpoena. They didn't want to cause that confusion. The way this should have happened is they should have turned it over. And this should have been decided by the jury, whether what those people saw was a different incident. But the state didn't want that to happen. Now, Mr. Kelly has conceded that the state should have done that. The only thing we're talking about today is whether it could have made a difference to this jury, whether it could have made a difference. That's why I say I don't understand a state judge who says, nah, it couldn't have made any difference at all. So completely, in fact, it corroborates the state's theory of the case. There's not a single defense lawyer who wouldn't have loved in this case to have a bit of corroboration. Did the other state judge do better? Judge Geller? He relied completely on Judge Berger's findings. But had a separate materiality discussion. I'm sorry, Judge? But had an additional materiality discussion. Judge Geller? Yes. Did, did. But I have to say about... You don't think it's adequate, I understand. No, I don't think it's adequate at all. I don't think the Court of Special Appeals ruling was adequate.  This was a horrible crime. People wanted a conviction. Nobody wants to overturn this case. But this was not a fair trial. You know, the Annapolis case you referred to was a little more egregious because basically at the, after the crime occurred, they basically rounded up a guy, sort of like from Casablanca, round up the usual suspects. They rounded up a guy who was a known delinquent down there and charged him with murder. And I, and I remember it well. You, you do too because Gary Christopher was representing the cooperator who had some information and he was trying to get him a better sentence. But the cooperator repeatedly told Mr. Christopher, look, I wasn't there that day. I don't know what happened. He then gets with the prosecutors. All of a sudden, he's there that day. That's the Brady information that you said in 99 should have been disclosed. And I submit that the facts of this case are actually a little bit better. If you think about it, there's not a police report. There's not a big police investigation that goes into that discrepancy in the Spicer case. All it is, is a statement that the prosecutor's aware of. Mr. Christopher's saying, no, wait a second. This guy doesn't know what happened that day. He can only tell you that that guy may have been casing the joint on other days. But he's told me repeatedly he wasn't there. The prosecutor knows it, but it's not in a police report. Here, we've got three separate reports, July, September, January, all identifying Benson and McKinsey as potential witnesses. They get to the end of that road, and they decide, nah, someday, some judge sitting on this after we keep him in jail for 20 years is going to look at this and agree, this was a separate incident. We didn't have to disclose this. But they should have. They should have, Your Honor. I'm getting close to running out of time. I'm going to try to sum up, just because I can't allow the passing of Harper Lee to pass without some analogy to kill a mockingbird. And I hope I'm not stretching too much, because I see it too often these days. But this case reminds me of the scene in both the book and the movie where Atticus has just heard that Tom Robinson's been shot 17 times trying to climb over the wall. You might recall, even the police said if he had two good arms, he would have made it. His reaction, as he describes it to Scout and his family, is a lawyer's reaction. We had a shot. We had such a good chance. He was referring, of course, to their chances on appeal. Your Honor, the defense had a chance in this case, but the state took it away. They should have known about this witness. The issues you're focused on should have been decided by a jury, not by appellate judges, not by Judge Bennett, not by us standing here today. The jury has a right to hear about this. And that's all we ask for. Judge Bennett has ordered a new trial. We ask for that trial so that Mr. Nicholas can finally have the chance to present all of the evidence to the jury in a fair way. I gather a new trial 20 years later is going to be, basically, it's hard to restage a trial, isn't it? Difficult for both sides, Your Honor. Difficult for both sides. But the only fair way to right the wrong that's been done here. All right. Thank you. Thank you, Mr. Guenther. Mr. Kelly? Your Honor, the Spicer case, for example. I mean, that was a case where the defendant- I didn't mean to regurgitate that. It was just Mr. Guenther's ad- Right, but it's an important- That was a case where a witness identified the defendant as the culprit to the police, and it told somebody else that the defendant couldn't have been there on that particular day. That was stark impeachment evidence of a witness that testified for the stated trial. Well, it's even worse because the person who committed the assault was short, about 5'6", and had a limp. No, excuse me, ran. Ran quickly. And the person they convicted was a person who was 6'2", and had a limp, and couldn't have run. He had had some big operation years before. And so the only identifying evidence didn't even come close. But let's set that aside. Right. I think it's important. Is my recollection of the Spicer case is right. I can't remember if the hearing was in state court and federal court, but there was a hearing, an evidentiary hearing, in which this evidence was developed. I find compelling, I'm not sure if the court does or not, that when Mr. Nicholas went back into state court, he didn't ask to put on any new evidence. You could order- you could uphold the decision below that there's- that Mr. Nicholas is entitled to a new trial, and we could go to trial, and as far as we know, these witnesses might not testify. A conviction 20 years later could go to a retrial based on these two witnesses, and we're left standing here just conjecturing whether those witnesses would ever testify. Because based on those statements, those witnesses won't help Mr. Nicholas. This is a case that will be 10 years old come this fall. I think one of the extent of- Of course if it's an injustice, it's an injustice. Right, but I think the length of the case does suggest if this was that unreasonable, I think it would have hit somebody in the face right away. This case has gone through the state court system multiple times. The state courts have evaluated it. Judge Berger has been acknowledged to be a careful jurist by the appellee. He is a careful jurist. He looked at it carefully, and he made the right decision. I would like to at least address the comment that I've confessed or I've relented that this material should have been disclosed. I believe my words as- obviously I've litigated this case for 10 years. I've been fighting for this on the state side for 10 years. I certainly wasn't conceding anything in the court proceedings. And as it stated in the brief, and it was just suggested, my words were if they had divulged this Brady material, we wouldn't be sitting in here today. We wouldn't have- this wouldn't be a claim. That would have been great, but it's not. We're here. We're arguing the case. I would argue that the state court judgments in this case survived that scrutiny, and that the judgment below should be reversed. That's why they should always just disclose this stuff. It's just, you know, if it's material, it's Brady and has to be disclosed. If it's not material, you've disclosed it. You don't have to worry about it. It's not going to be helpful to them, and they can spend all their time chasing that rabbit. And it's always better if this stuff is disclosed rather than prosecutors parsing whether or not to give something over. And it's my opinion that Judge Bennett has that same philosophy. It is a good philosophy. And it colored his judgment in this case because he was distressed that it wasn't disclosed. But at the end of the day, I think he did his- he was so frustrated with the state court system not applying the same sort of Brady standard that he applied, he removed himself from the AEDPA standard and didn't look for the state court judgments for reasonableness. He actually just almost evaluated in terms of direct review, substituted his judgment, and came with a result that he thought was fair. But I believe in this case, the state court judgments were reasonable. Mr. Nicholas did get a fair hearing in state court, and the judgment below should be reversed. All right. All right. We'll adjourn court for today. We'll come down and greet counsel. And then what I'm proposing for my colleagues is that we remain in the well of the court, and we can talk with the students from William & Mary who will undoubtedly evaluate your performances here today. Although I must say you did well. So we'll come down and greet counsel. Adjourn court first. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Paul V. Niemeyer, Diana Gribbon Motz, Max O. Cogburn Jr.